# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION AT DAYTON

| | |
|---|---|
| MARK VASTINE, | :  Case No. 3:16-cv-290 |
| | : |
|      Plaintiff, | : |
| | : |
| | :  Magistrate Judge Sharon L. Ovington |
| vs. | :  (by full consent of the parties) |
| | : |
| NANCY A. BERRYHILL, | : |
| COMMISSIONER OF THE SOCIAL | : |
| SECURITY ADMINISTRATION, | : |
| | : |
|      Defendant. | : |

---

## DECISION AND ENTRY

---

## I.    <u>Introduction</u>

Plaintiff Mark Vastine brings this case challenging the Social Security Administration's denial of his applications for period of disability, Disability Insurance Benefits, and Supplemental Security Income. He first applied for Supplemental Security Income on April 16, 2013, asserting that he could no longer work a substantial paid job due to bipolar I disorder and episodic mood disorder. While his first application was pending, he filed an application for period of disability and Disability Insurance Benefits. Administrative Law Judge (ALJ) Mark Hockensmith concluded that he was not eligible for any benefits because he is not under a "disability" as defined in the Social Security Act.

The case is before the Court upon Plaintiff's Statement of Errors (Doc. #9), the Commissioner's Memorandum in Opposition (Doc. #12), Plaintiff's Reply (Doc. #13), and the administrative record (Doc. #8).

Plaintiff seeks a remand of this case for payment of benefits or, at a minimum, for further proceedings. The Commissioner asks the Court to affirm ALJ Hockensmith's non-disability decision.

## II.    Background

Plaintiff asserts that he has been under a "disability" since December 31, 2012. He was forty-four years old at that time and was therefore considered a "younger person" under Social Security Regulations. *See* 20 C.F.R. §§ 404.1563(c), 416.963(c). He has a high school education. *See id.* §§ 404.1564(b)(4), 416.964(b)(4).[1]

### A.    Plaintiff's Testimony

Plaintiff testified at the hearing before ALJ Hockensmith that he could not handle working because he is in "such a depressed state …." (Doc. #8, *PageID* #83). "I'm crying very often. I am upset about the past and the future. I have a hard time getting along with other people." *Id.* In response to his attorney asking if there was anything else he wanted to tell the ALJ, he explained, "I feel hopeless, that's my feelings. I don't know what I could tell him that would show him what I'm going through in my life. No, I don't know what words to use. I'm not very – I don't have a big vocabulary." *Id.* at 99.

_____

[1] The remaining citations will identify the pertinent Disability Insurance Benefits Regulations with full knowledge of the corresponding Supplemental Security Income Regulations.

Plaintiff testified that his childhood trauma "overrules how I feel. … It controls my whole day. It controls my whole damn life." *Id.* at 95-96. His goal of treatment is "[t]o die in the right state of mind, to not feel so condemned and hopeless …." *Id.* at 97. When asked if he thought treatment would eventually lead to his ability to work, Plaintiff responded, "I can tell you that's a nice thought, I don't know if I can do it, that's a nice thought. That's the goal. That's the plan." *Id.*

Plaintiff has panic attacks at least once per week. *Id.* at 93. They generally last an hour. *Id.* As soon as he is able to get away from the situation that caused his panic, he begins to calm down. *Id.*

At the time of the hearing, Plaintiff was seeing Dr. DeLong every two weeks. *Id.* at 88. "[Dr. DeLong] just lets me talk about my past, because that's where I feel like most of my hang-ups are …, that's where I feel like they're at. I've lost my future, it's gone and my past is a piece of shit and I don't know what to do about it most of the time, it just haunts me." *Id.* at 88-89. Plaintiff also sees Theresa "Tess" Lambert, CNS, for counseling. *Id.* at 89, 2230.

Plaintiff stopped taking all of his medications a few months before the hearing. *Id.* at 89. He did not believe they were helping him as they did not stop him from crying, worrying, or thinking about his past. *Id.* And, "They had my father on all those meds, too, and you know what he done? He shot himself." *Id.* at 91. Plaintiff was hospitalized in early 2015 because "[he] just get[s] suicidal sometimes." *Id.*

When asked about his living arrangement, Plaintiff explained that Dr. Graham has "a set of half-way houses" for individuals who have just been released from prison. *Id.* at

3

74. Plaintiff arrived at one such house in September 2009 and, although it is typically for short-term stays, he remained. *Id*. When asked how he was able to stay for so long, he answered, "Momma's prayers, I guess." *Id.* at 84. The house has four bedrooms that are each rented out to single individuals and the common areas are shared. *Id.* at 75. Each individual is expected to keep the house—including their bedrooms—clean. *Id.* at 83-84. When asked how he gets along with the others that live in the house, Plaintiff responded, "It's very touchy, I stay to myself in my room. They do what they want to do, and I do what I do." *Id.* He has, however, gotten into to arguments with roommates: "at least one guy comes through in two, three months -- 90-day period, there's an altercation. It's just hard to get along with people that were raised different than me and what not." *Id.* at 76. Plaintiff tries to stay inside his house. *Id.* at 92. He goes to the grocery store and buys three gallons of milk about every three weeks. *Id.* He described grocery shopping as "frantic" because he panics and, sometimes, leaves all his stuff in an aisle and goes home. *Id*.

Plaintiff believes that he should continue to live at the house because it has a support group. *Id.* at 85. He has leaned on Dr. Graham a lot: "Suicidal notes, a lot of times he'll talk me through things, talk me through a real bad time or a real bad day." *Id*.

Plaintiff has some physical issues as well. He has pain in his legs and feet that his doctor told him was neuropathy. *Id.* at 86. He described the pain as aggravating. *Id.* at 87. When asked if it limits him, he responded, "I think it just makes me real shitty in attitude, I don't think it limits me too awful much." *Id*. However, he explained, "I can't sit down for a great deal of time, I've got to get up on my sore feet, it actually makes

them feel better to be on my feet and stomp out the pain and because it feels like there's really things wrong with my bones and stuff …." *Id.* Plaintiff's doctor prescribed Tramadol, and when asked if it helps, he replied, "Well, I don't know. He says it does, so I agree with him." *Id.* He also has restless leg syndrome, and his back aches. *Id.* at 86.

At the time of the hearing, Plaintiff was not working. *Id.* at 76. His last job— working for a cabinet builder—ended in 2013 after he had worked there about a year. *Id.* at 76-77. He was laid off when a coworker found out that he committed a crime and notified their boss. *Id.* at 77. A few weeks later, Plaintiff returned to work and the same coworker "started giving me a [hard] time about my crime." *Id.* at 78. He only worked for a few days: "I just left. I just couldn't take it. … I was having panic attacks and crying all the damn time." *Id.* Since that time, he has not worked. Dr. Graham offered him cash to work on some windows but after working on them for two days, Plaintiff told him he was not able to do it. *Id.* at 79.

**B.     Dr. John Graham**

Dr. Graham, the executive director of Good Samaritan Home, testified at the hearing before ALJ Hockensmith and sent a letter to Darke County Mental Health detailing his relationship with Plaintiff. Good Samaritan Home is a "nonprofit agency contracted with the Department of Corrections to offer temporary housing for ex-offenders coming back home from prison." *Id.* at 100. On average, men stay for 120 days. *Id.* at 101. But Plaintiff has been there since 2009. *Id.* Dr. Graham explained, "We developed what we called transitional or long-term housing, it's affordable housing for a basic rate. Then we continue mentoring them and the intent is to use housing as a

way to mentor so they can either get jobs, get stability or develop some sort of stable relationships." *Id*.

Dr. Graham indicated that when Plaintiff arrived at the home, there were "clear signs of depression and extreme anxiety regarding being in public situations." *Id.* at 1002. Nevertheless, Plaintiff was able to find some temporary work. *Id*. Eventually, as Plaintiff's mental health issues continued, Dr. Graham recommended he get treatment at Darke County Mental Health. *Id*. Unfortunately, despite mental health treatment, "his emotional state has continued to deteriorate …." *Id*. He became reclusive and spoke of suicide. *Id.* at 102.

During Plaintiff's periods of unemployment, Dr. Graham allowed him to work off his housing costs. *Id.* at 104. In 2011 and 2012, Plaintiff was, for example, able to paint rooms. *Id*. But, more recently, Dr. Graham offered him a project involving remodeling windows where he could work alone. *Id.* Plaintiff was unable to complete the project: "he worked 10 hours, if that, couldn't even complete it, just sweating, he was shaking, upset. He said he couldn't handle the work, … and I think [he's] a good worker, but he just mentally couldn't handle the pressure." *Id*.

Dr. Graham concluded,

> I'm not a psychologist, but my specialty is working one-on-one with men like Mark. And our program wasn't designed for this long. But, he's unique. I think he's a very -- a good person, I think he has great potential, but he's extraordinarily damaged from his past. He's a victim who's become a victimizer and feels incredibly guilty because his victimizer was his father and a pastor. So, the issues are phenomenal. He's in extensive therapy now. And we're committed to keep him as long as -- I don't mean keep in a negative sense, but

6

> we're committed to him for as long as it takes. And my goal
> is that he can just have a degree of stability then the long term
> we can help him. …

*Id.* at 105-06. And, Dr. Graham warned, "without immediate and long-term therapy, I believe that his self-destructive behavior will most likely continue to its obvious conclusion." *Id.* at 1002.

### C.    Medical Opinions

#### i.    Irfan Dahar, M.D.

Dr. Dahar, Plaintiff's treating psychiatrist, completed a mental impairment questionnaire on October 27, 2014. He diagnosed bipolar disorder and mood disorder. *Id.* at 1945. He indicated that Plaintiff's signs and symptoms include: poor memory; sleep and mood disturbances; anhedonia or pervasive loss of interests; feelings of guilt/worthlessness; difficulty thinking or concentrating; suicidal ideation or attempts; social withdrawal or isolation; flat affect; and intrusive recollections of a traumatic experience. *Id.* He noted that Plaintiff's treatment consists of "medications to stabilize" but they have only had "limited success" and his "depressed [and] isolative symptoms continue." *Id.* at 1946. Dr. Dahar opined that Plaintiff's impairments or treatment would cause him to be absent from work more than three times a month. *Id.* at 1947. He has extreme deficiencies of concentration, persistence, or pace resulting in failure to complete tasks in a timely manner. *Id.* He has marked restrictions of activities of daily living; marked difficulties in maintaining social functioning; and marked episodes of deterioration or decompensation in work. *Id.*

### ii.    Alan R. Boerger, Ph.D.

On February 27, 2012, Dr. Boerger evaluated Plaintiff.  He diagnosed post-traumatic stress disorder and dysthymic disorder and assigned a global assessment of functioning score of 52.  *Id.* at 900.  He opined Plaintiff "appears to have had problems with chronic depression and anxiety which dated back to his childhood where he experienced physical, sexual and emotional abuse."  *Id.*  And, "[b]ecause of the longstanding nature of [Plaintiff's] emotional difficulties, symptoms are likely to be present for the indefinite future."  *Id.*

Dr. Boerger noted the Plaintiff was able to recall two of four objects after five minutes and recalled seven digits forward and six backwards.  *Id.*  He was nervous while performing serial sevens and made eight errors.  *Id.* at 901.  Dr. Boerger concluded that Plaintiff's "anxiety and depression are likely to limit his ability to deal with work pressures in the work setting."  *Id.*

### iii.    Gilbert W. Butler, Psy.D.

Dr. Butler examined Plaintiff on December 11, 2013 and completed a mental functional capacity assessment.  *Id.* at 1438.  He opined Plaintiff was markedly limited in his ability to understand, remember, and carry out detailed instructions; maintain attention and concentration for extended periods; accept instructions and respond appropriately to criticism from supervisors; and respond appropriately to changes in a work setting.  *Id.*  He concluded Plaintiff is unemployable.  *Id.*

#### iv.     Kristen Haskins, Psy.D., and Karla Voyten, Ph.D.

Dr. Haskins reviewed Plaintiff's records on August 1, 2013.  She opined Plaintiff has one severe impairment—affective disorder.  *Id.* at 177.  He has a moderate restriction of activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and no episodes of decompensation.  *Id.*  Dr. Haskins opined that Plaintiff should be limited to a routine environment with non-strict production standards, infrequent changes, and access to a supervisor for support.  *Id.* at 179-80.  Additionally, he "should be limited to superficial contact with coworkers and the public."  *Id.* at 180.  She concluded Plaintiff is not disabled.  *Id.* at 182.

Dr. Voyten reviewed Plaintiff's records on November 18, 2013 and confirmed Dr. Haskins' assessment.  *Id.* at 185-96.

## III.     Standard of Review

The Social Security Administration provides Disability Insurance Benefits and Supplemental Security Income to individuals who are under a "disability," among other eligibility requirements.  *Bowen v. City of New York,* 476 U.S. 467, 470 (1986); *see* 42 U.S.C. §§ 423(a)(1), 1382(a).  The term "disability"—as defined by the Social Security Act—has specialized meaning of limited scope.  It encompasses "any medically determinable physical or mental impairment" that precludes an applicant from performing a significant paid job—i.e., "substantial gainful activity," in Social Security lexicon.  42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A); *see Bowen,* 476 U.S. at 469-70.

Judicial review of an ALJ's non-disability decision proceeds along two lines: "whether the ALJ applied the correct legal standards and whether the findings of the ALJ are supported by substantial evidence." *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007). Review for substantial evidence is not driven by whether the Court agrees or disagrees with the ALJ's factual findings or by whether the administrative record contains evidence contrary to those factual findings. *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 722 (6th Cir. 2014); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). Instead, the ALJ's factual findings are upheld if the substantial-evidence standard is met—that is, "if a 'reasonable mind might accept the relevant evidence as adequate to support a conclusion.'" *Blakley*, 581 F.3d at 407 (quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance …." *Rogers*, 486 F.3d at 241 (citations and internal quotation marks omitted); *see Gentry*, 741 F.3d at 722.

The other line of judicial inquiry—reviewing the correctness of the ALJ's legal criteria—may result in reversal even when the record contains substantial evidence supporting the ALJ's factual findings. *Rabbers v. Comm'r of Soc. Sec.*, 582 F.3d 647, 651 (6th Cir. 2009); *see Bowen*, 478 F.3d at 746. "[E]ven if supported by substantial evidence, 'a decision of the Commissioner will not be upheld where the SSA fails to follow its own regulations and where that error prejudices a claimant on the merits or deprives the claimant of a substantial right.'" *Rabbers*, 582 F.3d at 651 (quoting in part

*Bowen*, 478 F.3d at 746, and citing *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 546-47

(6th Cir. 2004)).

## IV.     **The ALJ's Decision**

As noted previously, it fell to ALJ Hockensmith to evaluate the evidence

connected to Plaintiff's application for benefits.  He did so by considering each of the

five sequential steps set forth in the Social Security Regulations.  *See* 20 C.F.R. §

404.1520.[2]  He reached the following main conclusions:

Step 1:     Plaintiff has not engaged in substantial gainful employment since
            December 31, 2012.

Step 2:     He has the severe impairments of post-traumatic stress disorder
            (PTSD), episodic mood disorder, and bipolar disorder.

Step 3:     He does not have an impairment or combination of impairments that
            meets or equals the severity of one in the Commissioner's Listing of
            Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1.

Step 4:     His residual functional capacity, or the most he could do despite his
            impairments, *see Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239
            (6th Cir. 2002), consists of "a full range of work at all exertional
            levels but with the following nonexertional limitations:  (1) simple,
            routine tasks; (2) static work environment with few changes in
            routine; (3) no fast paced work or strict production quotas; (4) no
            contact with public; (5) only brief, superficial contact with coworkers;
            and (6) occasional contact with supervisors."

Step 4:     He is capable of performing past relevant work as a woodworking
            machine operator.

Step 5:     He could perform a significant number of jobs that exist in the
            national economy.

---

[2] The remaining citations will identify the pertinent Disability Insurance Benefits Regulations with full
knowledge of the corresponding Supplemental Security Income Regulations.

(Doc. #8, *PageID* #s 121-37).  These main findings led the ALJ to ultimately conclude that Plaintiff was not under a benefits-qualifying disability.  *Id.* at 137.

**V.**     **Discussion**

Plaintiff contends that the ALJ erred in rejecting his treating source's opinion and in weighing other medical opinions.  He also asserts that the ALJ's credibility findings do not merit deference.  The Commissioner maintains that substantial evidence supports both the ALJ's evaluation of the medical opinions and the ALJ's finding that Plaintiff was not fully credible.

**A.**     **Medical Opinions**

Social Security Regulations require ALJs to adhere to certain standards when weighing medical opinions.  "Key among these is that greater deference is generally given to the opinions of treating physicians than to those of non-treating physicians, commonly known as the treating physician rule."  *Rogers,* 486 F.3d at 242 (citations omitted).  The rule is straightforward:

> Treating-source opinions must be given "controlling weight" if two conditions are met: (1) the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques"; and (2) the opinion "is not inconsistent with the other substantial evidence in [the] case record."

*Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (quoting in part 20 C.F.R. § 404.1527(c)(2)); *see Gentry*, 741 F.3d at 723.

If the treating physician's opinion is not controlling, "the ALJ, in determining how much weight is appropriate, must consider a host of factors, including the length, frequency, nature, and extent of the treatment relationship; the supportability and

consistency of the physician's conclusions; the specialization of the physician; and any other relevant factors." *Rogers*, 486 F.3d at 242 (citing *Wilson*, 378 F.3d at 544).

The Regulations also require ALJs to provide "good reasons" for the weight placed upon a treating source's opinions. *Wilson*, 378 F.3d at 544. This mandatory "good reasons" requirement is satisfied when the ALJ provides "specific reasons for the weight placed on a treating source's medical opinions." *Id.* (quoting Soc. Sec. R. 96-2p, 1996 WL 374188, at *5 (Soc. Sec. Admin. July 2, 1996)). The goal is to make clear to any subsequent reviewer the weight given and the reasons for that weight. *Id.* Substantial evidence must support the reasons provided by the ALJ. *Id.*

ALJ Hockensmith found, "Dr. Dahar's opinion is not entitled to controlling or deferential weight under the Regulations." (Doc. #8, *PageID* #133). He instead assigned it little weight. *Id.* Although the ALJ included the treating physician rule in his decision, he does not appear to have applied it. He does not address the second condition— whether the opinion is not inconsistent with the other substantial evidence in the record. He similarly does not explicitly refer to the first condition—whether the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques—but he does criticize Dr. Dahar's for lacking support. Specifically, he found that Dr. Dahar's assessment is "unsupported by objective signs and findings in [his] treatment notes, as well as in the preponderance of the other mental health records." *Id.* However, it is not clear if the ALJ was addressing the first condition or if he was referring to the supportability factor. This uncertainty "hinders a meaningful review of whether the ALJ properly applied the treating-physician rule that is at the heart of this regulation."

*Gayheart,* 710 F.3d at 377.  It likewise conflicts with the requirement that the decision "must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." Soc. Sec. R. 96-2p, 1996 WL 374188, at *5.

It seems more likely that he was referring to the supportability factor, as the treating physical rule does not require a physician's opinion to be supported by objective signs and findings.  Instead, the rule requires that the opinion be well-supported by medically acceptable clinical and laboratory diagnostic techniques.  This distinction is particularly important in this case, given Plaintiff's mental impairments:

> [A] psychiatric impairment is not as readily amenable to substantiation by objective laboratory testing as a medical impairment ... consequently, the diagnostic techniques employed in the field of psychiatry may be somewhat less tangible than those in the field of medicine....  In general, mental disorders cannot be ascertained and verified as are most physical illnesses, for the mind cannot be probed by mechanical devices in order to obtain objective clinical manifestations of medical illness....

*Blankenship v. Bowen*, 874 F.2d 1116, 1121 (6th Cir. 1989) (quoting *Poulin v. Bowen*, 817 F.2d 865, 873-74 (D.C. Cir. 1987); *Lebus v. Harris*, 526 F.Supp. 56, 60 (N.D. Cal. 1981)).  Accordingly, to the extent ALJ Hockensmith was referring to the treating physician rule—and thus requiring objective evidence rather than medically acceptable clinical and laboratory diagnostic techniques—he applied the wrong standard and, in doing, required more of Plaintiff than the Regulations require.

To the extent the ALJ was discussing the supportability factor, substantial evidence does not support his conclusion that Dr. Dahar's opinion was "unsupported."

Indeed, as the ALJ observed, "the DCMHC progress notes show only some depressed and/or anxious moods, a blunted and/or flat affect, racing thoughts, rocking behaviors, confusion, poor memory, and references by the claimant of suicidal ideation." (Doc. #8, *PageID* #133). Despite the ALJ's attempt to minimalize these findings, they nevertheless support Dr. Dahar's opinion.

The ALJ further criticizes Dr. Dahar's opinions because he "provided no specific explanation for his findings …." *Id*. In support, after noting the observations listed above, he emphasizes, "on several other occasions, these notes document euthymic, normal, and/or bright moods and affect, normal and/or goal-directed thought processes, normal speech, appropriate thought content, no abnormalities of perception, cooperative behavior, fair insight and judgment, intact cognition, normal attention and concentration, and no suicidal ideation." *Id.* (citing Exhibits 13F [*PageID* #s 930-1001], 15F [*PageID* #s 1013-15], 20F [*PageID* #s 1796-944], and 25F [*PageID* #s 2192-240]). The ALJ, moreover, found, "the recent records indicate that [Plaintiff] was doing relatively well." *Id.* (citation omitted).

The fact that Plaintiff was doing relatively well or has, for example, normal/goal-directed thought processes or normal speech does not lead to a reasonable conclusion that he is able to work given the fluctuating nature of his mental health problems. *Cf. Holohan v. Massanari,* 246 F.3d 1195, 1205 (9th Cir. 2001) ("That a person who suffers from severe panic attacks, anxiety, and depression makes some improvement does not mean that the person's impairments no longer seriously affect her ability to function in a workplace."); *Gentle v. Barnhart*, 430 F.3d 865, 867 (7th Cir. 2005) ("The administrative

law judge's casual equating of household work to work in the labor market cannot stand.").

The ALJ overlooks or ignores evidence that tends to show Plaintiff reported that he was doing better than he actually was. For example, Plaintiff's counselor, William Baumann, LISW-S, noted that Plaintiff felt his medications were not working "but feel[s] reluctant to talk to Dr. [Dahar] about this 'because I'm not sure what to say – we [rehearsed] the specifics of what he needed to identify – the rocking behaviors that emerged since meds that embarrass him; [hopeless] and ongoing thoughts of suicide; lack of energy, crying spells, isolating self; unable to fall asleep and stay asleep due to ruminations ….'" (Doc. #8, *PageID* #1814). Significantly, of the nine times Dr. Dahar saw Plaintiff, he only noted twice that Plaintiff had a bright mood and affect, and both occurred prior to Plaintiff's conversation with Mr. Baumann. *Id.* at 998. After they discussed his difficulty reporting problems, Dr. Dahar consistently documents a deterioration of his condition. *Id.* at 1816, 1827, 1886. Indeed, Dr. Dahar indicated Plaintiff's status was "worsening" at least four times. *Id.* at 1892, 1990, 2196, 2202.

In addition, Plaintiff's counselor, Theresa D. Lambert, CNS, noted that he "[h]as told [his] psychiatrist that he was fine [because] he didn't want any more medications." *Id.* at 2221. Plaintiff's statement was reasonable at that time, as it followed his hospitalization for confusion and bizarre behavior—both of which were attributed to overmedication. *Id.* at 129, 2221. There is no indication in the ALJ's decision that he considered this evidence. The ALJ's selective reading of the record constitutes error. "[A] substantiality of evidence evaluation does not permit a selective reading of the

record. 'Substantiality of the evidence must be based upon the record taken as a whole. Substantial evidence is not simply some evidence, or even a great deal of evidence. Rather, the substantiality of evidence must take into account whatever in the record fairly detracts from its weight.'" *Brooks v. Comm'r of Soc. Sec.*, 531 F. App'x 636, 641 (6th Cir. 2013) (quoting, in part, *Garner v. Heckler*, 745 F.2d 383, 388 (6th Cir. 1984) (internal citations and quotation marks omitted)).

ALJ Hockensmith did not provide any additional reasons for discounting Dr. Dahar's opinion. He overlooked or ignored factors that tend to fall in Dr. Dahar's favor. For example, the ALJ does not address the length of their treatment relationship. *See* 20 C.F.R. § 416.927(c)(2)(i) ("Generally, the longer a treating source has treated you and the more times you have been seen by a treating source, the more weight we will give to the source's medical opinion."). Dr. Dahar first evaluated Plaintiff in January 2013 and last saw him in September 2014. (Doc. #8, *PageID* #s 954, 2198). In that time, Dr. Dahar saw Plaintiff at least nine times, thus gaining a clear longitudinal picture of Plaintiff's problems. *Id.* at 954, 998, 1000, 1816, 1827, 1886, 1894, 2192, 2198.

Further, the ALJ did not discuss the consistency of Dr. Dahar's opinion with the record. *See* 20 C.F.R. § 404.1527(c)(4) ("Generally, the more consistent a medical opinion is with the record as a whole, the more weight we will give to that medical opinion."). Dr. Dahar's opinion is not only consistent with his treatment notes and Mr. Baumann's, it is also consistent with Dr. Boerger's assessment, Dr. Butler's evaluation, and Dr. Graham's letter—all of which indicate Plaintiff's ability to work is limited by his mental impairments. (Doc. #8, *PageID* #s 901, 1002, 1438).

Thus, the reasons provided by ALJ Hockensmith do not constitute "good reasons" for discounting Dr. Dahar's opinions. "Because the reason-giving requirement exists to 'ensur[e] that each denied claimant receives fair process,' … an ALJ's 'failure to follow the procedural requirement of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight' given '*denotes a lack of substantial evidence,* even where the conclusion of the ALJ may be justified based upon the record.'" *Blakley*, 581 F.3d at 407 (quoting *Rogers,* 486 F.3d at 243); *see* Soc. Sec. R. 96-2p, 1996 WL 374188, at *5 ("[T]he notice of the determination or decision must contain specific reasons for the weight given to the treating source's medical opinion …").

In contrast to the little weight assigned to Dr. Dahar's opinion, the ALJ assigned the opinions of Drs. Zwissler, Haskins, and Voyten, the record-reviewing physicians, "great weight … with greatest weight to the assessments of Drs. Haskins and Voyten." (Doc. #8, *PageID* #130). The ALJ found, "Their assessments are supported by objective signs and findings in the preponderance of the record, including the records submitted after their assessments." *Id.* Specifically, the ALJ points out that despite Plaintiff's mental impairments, he "lives mostly independently at the halfway house and has the responsibility of keeping the house and his room clean. While he stays to himself and prefers to work alone, he can go grocery shopping once every few weeks." *Id.* The ALJ thus "essentially adopted the limitations of the DDD reviewers for low stress work with limited social contacts but have further limited the claimant to no public contact with only brief and superficial contact with coworkers." *Id.* at 130-31. Further, the ALJ

limited Plaintiff to simple, routine tasks because he observed that Dr. Zwissler opined that he was limited to simple, routine tasks; "some of the mental health records show some difficulty with concentration"; and he complained of drowsiness due to medications. *Id.*

Plaintiff's ability to go grocery shopping once every three weeks does not reasonably support the conclusion that he is able to interact with others "on *a sustained basis,* which is how the functional limitations of mental impairments are to be assessed." *Gayheart,* 710 F.3d at 377 (citing 20 C.F.R. § 404.1520a(c)(2); 20 C.F.R. Part 404, Subpart P, Appendix 1, at 12.00 ("Social functioning refers to your capacity to interact independently, appropriately, effectively, and on a sustained basis with other individuals.")). The ALJ also overlooks that Plaintiff described grocery shopping as "frantic" and reported that he often panics and has to leave the store without his groceries. (Doc. #8, *PageID* #92). Similarly, Plaintiff's abilities to live *mostly* independently and keep his room and the shared areas of his house clean do not suggest that he is capable of performing simple, routine tasks on a sustained basis.

Further, while the ALJ criticized Dr. Dahar's opinion because he did not provide an explanation for his opinions, the ALJ did not criticize the record-reviewing physicians despite their clear lack of explanation. In this way, the ALJ applied greater scrutiny to Dr. Dahar's opinion than he did to the record reviewing physicians' opinion. This constitutes error: "[T]he regulations do not allow the application of greater scrutiny to a treating-source opinion as a means to justify giving such an opinion little weight. Indeed, they call for just the opposite." *Gayheart*, 710 F.3d at 374.

Accordingly, for the above reasons, Plaintiff's Statement of Errors is well taken.[3]

**B.      Remand**

A remand is appropriate when the ALJ's decision is unsupported by substantial evidence or when the ALJ failed to follow the Administration's own regulations and that shortcoming prejudiced the plaintiff on the merits or deprived the plaintiff of a substantial right. *Bowen*, 478 F.3d at 746. Remand may be warranted when the ALJ failed to provide "good reasons" for rejecting a treating medical source's opinions, *see Wilson*, 378 F.3d at 545-47; failed to consider certain evidence, such as a treating source's opinions, *see Bowen*, 478 F.3d at 747-50; failed to consider the combined effect of the plaintiff's impairments, *see Gentry*, 741 F.3d at 725-26; or failed to provide specific reasons supported by substantial evidence for finding the plaintiff lacks credibility, *see Rogers*, 486 F.3d at 249.

Under sentence four of 42 U.S.C. § 405(g), the Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." *Melkonyan v. Sullivan*, 501 U.S. 89, 99 (1991). Consequently, a remand under sentence four may result in the need for further proceedings or an immediate award of benefits. *E.g., Blakley*, 581 F.3d at 410; *Felisky v. Bowen*, 35 F.3d 1027, 1041 (6th Cir. 1994). The latter is warranted where the evidence of disability is overwhelming or where the evidence of disability is strong while contrary evidence is lacking. *Faucher v. Sec'y of Health & Human Servs.*, 17 F.3d 171, 176 (6th Cir. 1994).

---

[3] In light of the above discussion, and the resulting need to remand this case, an in-depth analysis of Plaintiff's other challenges to the ALJ's decision is unwarranted.

A judicial award of benefits is unwarranted in the present case because the evidence of disability is not overwhelming and the evidence of disability is not strong while contrary evidence is lacking. However, Plaintiff is entitled to an Order remanding this case to the Social Security Administration pursuant to sentence four of § 405(g) due to the problems discussed above. On remand, the ALJ should be directed to evaluate the evidence of record, including the medical source opinions, under the applicable legal criteria mandated by the Commissioner's Regulations and Rulings and by case law; and to evaluate Plaintiff's disability claim under the required five-step sequential analysis to determine anew whether Plaintiff was under a disability and whether his applications for Disability Insurance Benefits and Supplemental Security Income should be granted.

### IT IS THEREFORE ORDERED THAT:

1. The Commissioner's non-disability finding is vacated;

2. No finding is made as to whether Plaintiff Mark Vastine was under a "disability" within the meaning of the Social Security Act;

3. This matter is **REMANDED** to the Social Security Administration under sentence four of 42 U.S.C. § 405(g) for further consideration consistent with this Decision and Entry; and

4. The case is terminated on the Court's docket.


Date:  September 25, 2017            *s/Sharon L. Ovington*
                                    Sharon L. Ovington
                                    United States Magistrate Judge